# United States Court of Appeals

## For the First Circuit

No. 03-1180

JUAN ALICIO SAMAYOA CABRERA and
BLANCA MARGARITA VELASQUEZ,

Petitioners,

v.

JOHN ASHCROFT,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Selya and Howard, Circuit Judges,
and Singal,[*] District Judge.

Harvey Kaplan, with whom Ilana Greenstein, Maureen O'Sullivan, Jeremiah Friedman and Kaplan, O'Sullivan & Friedman, LLP were on brief, for petitioners.
Isaac R. Campbell, Trial Attorney, Office of Immigration Litigation, with whom Peter D. Keisler, Assistant Attorney General, and Papu Sandhu, Senior Litigation Counsel, were on brief, for respondent.

May 4, 2004

---

[*] Of the District of Maine, sitting by designation.

**SINGAL**, **District Judge**.  Juan Alicio Samayoa Cabrera and Blanca Margarita Velasquez, citizens of Guatemala,[1]applied for asylum, relief under the Convention Against Torture, and withholding of removal.  The Immigration Judge ("IJ") denied the applications, and the Board of Immigration Appeals ("BIA") affirmed without opinion.  Mr. Samayoa and Ms. Velasquez petition for judicial review, claiming that the IJ erred in concluding that they are ineligible for asylum and withholding of removal.  We affirm the BIA's decision.

## I.    Background

Juan Alicio Samayoa Cabrera is a fifty-four-year-old man from the Quiche region of Guatemala.  His claims for asylum are based on his mistreatment at the hands of guerilla fighters in Guatemala from 1982 to 1992, which he attributes to his political opinion.  Following the events described below, he came to the United States illegally in 1992, and applied for asylum on December 27, 1993.  His case was finally heard by an Immigration Judge on February 4, 2002.  The oral decision rendered on that date was not in his favor, and he appealed to the BIA.  The BIA

---

[1] Ms. Velasquez, Mr. Samayoa's wife, is included in the asylum petition based solely on Mr. Samayoa's experiences.  While this opinion refers mainly to petitioner Samayoa, the decision rendered applies to both petitioners.

summarily affirmed the IJ's decision, and Samayoa petitioned this court for judicial review.

## A. Facts

The petitioners' testimony elicited the following facts. Mr. Samayoa's first run-in with the guerillas occurred in 1982, when his car was stopped by a group of guerillas who tied him up, put a gun to his head and threatened to kill him in order to steal gasoline from him. The guerillas warned Mr. Samayoa that if he mentioned the incident to authorities, they would kill him, and that they knew where he lived. Instead of following the guerillas' instructions, he reported the incident to an army colonel. The colonel advised him that he should leave town, but Mr. Samayoa did not want to, so the colonel made him an aide to the military commissioner, a volunteer position which entitled him to carry a gun. Thereafter, Mr. Samayoa was promoted to military commissioner, in which capacity he engaged in military recruiting. He also became the leader of his neighborhood civil patrol, a position that put him in charge of a group of five hundred patrolmen that protected the village from guerilla fighters.

Mr. Samayoa received between thirty and fifty death threats in the years after he became a military commissioner. The

threats were addressed to him by name, and explicitly stated that he would be killed by guerillas. In either 1987 or 1990, his wife found a bomb under his car outside their house, which she was able to deactivate before it detonated. In 1988, Mr. Samayoa was falsely accused of kidnapping. He was told afterwards that the plan had been for someone to kill him while he was in jail.

In 1991, a land mine exploded on Mr. Samayoa's property while he was walking to milk his cows. He was wounded in the face and was immediately surrounded by about eight armed men. (His son informed him later that there had been approximately sixty guerillas altogether.) Mr. Samayoa escaped on foot after fending them off with the pistol he had been issued by the military. In the meantime, the guerillas destroyed his truck. Soldiers who went looking for the guerillas that attacked Mr. Samayoa were bombed, and seven soldiers were killed.

In 1992, Mr. Samayoa was shot while driving along a mountainous road about forty kilometers from his home. Other vehicles were traveling along the road as well, and Mr. Samayoa swerved to avoid a bus when a land mine exploded nearby. At that point, twenty-five to thirty guerillas ran towards his car, shooting at him. Mr. Samayoa escaped when his passenger took control of the vehicle and transported them to a hospital in

Joyabaj. There was no fighting going on in the region at the time, and no other vehicles on the road were subjected to such an attack. While he was at the Joyabaj hospital, the building was subject to guerilla surveillance, but Mr. Samayoa was smuggled out and airlifted to a military hospital in Guatemala City. Mr. Samayoa was in a coma for three days. He remained in intensive care for a month and was guarded by two military personnel.

Upon his discharge from the hospital, Mr. Samayoa was unwilling to return to his home for fear of the guerillas, so his wife rented a house in Guatemala City. He was put on active payroll by the military and received outpatient treatment at the hospital. Even after Mr. Samayoa had relocated to Guatemala City, the guerillas continued to search for him.

Mr. Samayoa determined that he could not remain in Guatemala, and applied for a visa at the United States embassy. His application was denied, and although the Guatemalan military authorities offered to help him obtain a visa, he thought it best to enter the United States illegally. Even after he had left the country the guerillas continued to look for him.

**B. The IJ's Decision**

The IJ did not make an express finding, one way or the other, as to Mr. Samayoa's credibility, but concluded that he had

not suffered persecution on account of one or more of the five statutory grounds set forth in Section 101(a)(42)(A) of the Immigration and Nationality Act. The IJ determined that the acts suffered by Mr. Samayoa did not constitute persecution but were instead attributable to generalized violence in the area. Assuming for the sake of argument that Mr. Samayoa had been persecuted in the 1992 incident, the IJ concluded that there had not been a showing that he had been targeted on one or more of the five statutory grounds. The IJ noted that Ms. Velasquez was able to live peacefully in her home with hired security and that the guerillas had not come looking for Mr. Samayoa since shortly after he left Guatemala in 1992. The IJ noted that the civil war in Guatemala ended some time ago, and that although there remains a high level of crime, Mr. Samayoa did not appear to have a well-founded fear of future persecution on one or more of the five statutory grounds. Because Mr. Samayoa had not established eligibility for asylum, he was not eligible for withholding of removal. The IJ concluded that there had been no showing that Samayoa or his wife were eligible for protection under the Convention Against Torture.

## II. Discussion

On appeal, the BIA's findings of fact must be upheld "unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C § 1252(b)(4)(B); <u>Laurent</u> v. <u>Ashcroft</u>, 359 F.3d 59, 64 (1st Cir. 2004). Because the BIA summarily affirmed the IJ's decision, we review the IJ's decision. <u>Laurent</u>, 359 F.3d at 64 n.3.

As a prerequisite to establishing eligibility for asylum, an alien must establish that he is a refugee, as set forth in section 101(a)(42)(A) of the Immigration and Nationality Act. 8 U.S.C. § 1158(b). In that section, "refugee" is defined as:

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A). In order to demonstrate that he is a refugee, Mr. Samayoa must establish both that he suffers from a well-founded fear of persecution and that the feared persecution is based on one of the five statutory grounds.

The crux of Mr. Samayoa's petition for judicial review is that the IJ erred when she found that Mr. Samayoa had not been specifically targeted because of his opposition to the guerilla movement given the number of threats and attempts he had been subjected to. While Mr. Samayoa presents a sympathetic case and his argument that he was specifically targeted has some merit, he must also establish that he was persecuted on one of the five statutory grounds.

Mr. Samayoa argues that his task is not to establish the exact motivation of a persecutor, but only to demonstrate the reasonableness of a motivation which is related to one of the enumerated grounds. While an alien seeking asylum is not required to provide direct proof of his persecutors' motives, he must provide some evidence of such motives. INS v. Elias-Zacarias, 502 U.S. 478, 483-84 (1992). There is little to tie the alleged persecution to Mr. Samayoa's imputed political opinion other than the fact that after the first attack, he initiated his involvement with the military in order to secure the right to carry a weapon. Participation in a civil defense patrol does not by itself compel a conclusion that an individual is subject to politically-inspired persecution. See Aguilar-Solis v. INS, 168 F. 3d 565, 572 (1st Cir. 1999). Mr. Samayoa

has not provided such evidence as would require a reasonable factfinder to conclude that his fear of future persecution was based on his actual or imputed political opinion.

### III. Conclusion

For the reasons set forth above, the order of the BIA is **affirmed**.